Mohammed Abdraman versus, we have it as Eric Holder, Jr., it would now be Loretta Lynch. We'll now hear from Mr. Santanam. Good morning. May it please the Court. Your Honor, before I proceed into my argument, I would like to advise the Court that we recently learned from government's counsel that they may be altering their position in this case. I can't speak for the government, I'll let them speak on their behalf. We'll ask them. But my basic understanding is that they may be recommending a remand. On that point, before I jump in, I would like to say that although we are not opposed to a remand, we do believe under the circumstances, particularly as to the past persecution issue, that the facts and the arguments are well developed in the record and that this Court can and should, from a prudential standpoint, address those issues. I will focus my argument on the past persecution issue, for that matter, and if time permits, I'll jump into the well-founded fear argument as well. I actually, I've never seen a case where they were so interwoven, where the past persecution takes the form of this threat and hiding out for months until he can escape the country, and then based upon his fear at that time, and then the question is whether there's any reason why that would have dissipated. Yes, Your Honor. We do believe that they are very related issues. The past persecution issue certainly was many years in the past. The record is well set out, and the circumstances that occurred in the past certainly contribute to the well-founded fear. As a threshold matter regarding persecution, regardless of whether you look at it in the past or the future, we'd like to make abundantly clear to this Court that this is not a case about hypothetical or perceived harm. The harm in this case was very real. As the record establishes, in May 2005, the Shiitean government security forces rounded up, arrested, and disappeared Abdurman's uncle and relatives and others who had attended these political meetings. The fact is that no one has since heard from these individuals, and under common law, they're presumed dead. It's under these circumstances that we have to evaluate his claims. As to the past persecution point, the Shiitean government persecuted Abdurman in two ways, two specific legal ways. A, they persecuted Abdurman when they attempted to disappear, i.e., kill him, along with his family members and others who attended the political meetings, and B, they persecuted him by sufficiently threatening his life under the reasoning of NLA and other cases that this Court has decided, such as Escobar and Stanichkova, by disappearing his uncle, relatives, and the attendees of those meetings. Admittedly, as to the attempt element, this Court has not had an opportunity to fully explain the contours of when an attempt rises to the level of persecution, but we would direct this Court to the decisions of the 10th, 9th, and 11th Circuits that are cited in the opening brief, and in particular the Karki case from the 10th Circuit, which we believe provides a very good factual reference point. In that case, the asylum applicant was the target of a car bombing, but as a result of fortuitous last-minute changes in his travel plans, he wasn't in the car when the bomb went off, and the Justice Department argued in that case that he did not suffer physical harm, and therefore he did not suffer past persecution. The 10th Circuit disagreed, for good reason, and held that the attempt on the applicant's life, in and of itself, amounted to persecution, and we would submit that in this case, under the present record, there's hardly any dispute that if Abdurman was present at his uncle's home during the time of these arrests, he too would have been arrested, disappeared, and killed, and frankly we wouldn't be having this appeal. Thus, based on the attempt alone, we would submit that he had suffered past persecution. As to the threat aspect of it, the Chadian government persecuted him by sufficiently threatening his life under the reasoning of this court's decision in NLA, but I'd also point the court back to its decision in Escobar and Stanichkova. These cases, essentially, particularly NLA,  has to be taken into consideration in context of the treatment and persecution of his family members and others that are close to him. It's a totality of circumstances analysis, and we would submit that under the circumstances here, any reasonable person who was in his shoes, who had just had his uncle, close relatives, and others who had attended political meetings disappeared by the Chadian government, arrested and disappeared, in conjunction with the Chadian government coming to look for him and asking for him by name, would understand that his life and liberty was at stake. And we would also submit that under this record, there are other reference points, third parties, other Chadians familiar with the circumstances who plainly understood the threat from the Chadian government, and the most salient example of that in the record would be that of Hamid. That was Abdurman's friend, who on the day of the arrests raced to where he was to warn him not only of the arrests, but that the Chadian government was looking for him and that they had asked for him by name. We would submit that under these circumstances and under this court's reasoning in NLA, that this amounted to persecution. The circumstances of those two cases are very similar, and the government, for its part, largely dodges the NLA case throughout its brief. Mr. Snodden, the immigration judge and the BIA both seem to place a considerable amount of weight on evidence from country reports indicating that two of the key rebel groups in Chad had become inactive, that peace has broken out in Chadian politics. Could you address that evidence, please? Absolutely, Your Honor. First of all, the country report on which they most rely is the 2009 State Department report. We take not issue with the report itself, but the selective quoting that the board and the immigration judge and, frankly, the Justice Department has made from that report. I'm going to ask about that, but I'd ask you to address most specifically the two, the MDD and the MDJT, the two specific rebel groups that were the focus back in 2005. That's correct, Your Honor. As we explained in our briefing, the political climate in Chad, as a result of the political climate in Chad, there's often a lot of reshuffling among these rebel groups. And that's reflected in the reports. It is, Your Honor. And we've also described it in our briefing as well in terms of how these organizations have shifted and shuffled themselves. I would direct this court in particular to the footnote in our reply brief, footnote 6 on page 16, that shows that despite the government's claims, there are still active groups, as set forth in the record. And as a result of these active groups, Abdurman certainly is subject to potential harm if he were to return. I see that I'm approaching into my rebuttal time, and with the government's position, I would like to reserve the remainder of my time to respond. All right. Thank you very much, Mr. Sutton. Ms. Morgan? Good morning, Your Honors. May it please the court, I'm Carmel Morgan on behalf of the respondent, the U.S. Attorney General. I'm aware that the court spends a significant amount of time preparing for oral argument in every case, and so I profusely and sincerely apologize that the government has changed its position and no longer wishes to defend this matter. In fact, we request that the court remand the case... Actually, we didn't have anything better to do anyway, so don't feel bad. We ask that you remand the case to the Board of Immigration Appeals for two main reasons. The first is that the immigration judge never ruled on the petitioner's post-hearing motion to consider new evidence. That issue was raised in the brief to the board, although it was in a footnote, and the board also overlooked it. The second reason would be that the agency should reexamine its decision in light of the NLA case and other recent Seventh Circuit case law, as well as current country conditions in Chad. I was able to look at the 2013 country report for Chad, which does seem to indicate that there are current arrests of former rebels, arbitrary arrests, and enforced disappearances. So the scope of the remand, of course, is up to the court. We would just caution that the court not make the ultimate finding on past persecution because the board did not address the necessary nexus element. There's no discussion of nexus in... Which nexus? Which nexus? Oh, nexus to a protected ground, like a particular social group or... Is that in question at all here? Let me put it this way. You'd agree that what happened to the petitioner's uncle and every other male member of the household is persecution, right? Probably. I can't make that... Come on, they disappeared. It's been 10 years and nobody's heard from them. And is there any reason to doubt that that was based on several protected characteristics, imputed or actual political opinions, ethnicity, and membership in a social group? Yeah, I understand your question and concern. It's really INS versus Ventura that would require the remand. I agree that in all likelihood, the answer is yes, there is a nexus to any one of those grounds. But I don't think the court can make that ultimate decision. You could probably, however, reach the issue of whether his claim and the facts that contribute to that claim do amount to harm rising to the level of past persecution. They seem to use disappear as a verb. Is this a common reference to people who just don't see them anymore? They disappear then? I have heard that used as a verb. Yes, Your Honor. I think I heard it 30 years ago more in law school with reference to the Argentinian government. Disappear as a transitive verb. Ms. Morgan, I will say the court appreciates your candor. I can't speak for my colleagues on this. I assume we will grant a remand of some degree. I will be stunned and disappointed if this man is not entitled to asylum in the United States. I have never seen a stronger case. I had a lot of questions for you if you were going to be defending this, but I won't waste your time or anyone else's. Thank you, Your Honor. I don't want to make myself a hero in this, by the way, but I hope you understand that I wasn't the briefing attorney, and so that's why the timeline was pushed to the very last minute. It does happen from time to time, and I do, again, apologize. Thank you, Ms. Morgan. Mr. Sontenheim, anything else? I did want to bring to the court's attention at least one authority that we're aware of, which is the Wani Site case. The citation to that is 656 F3D 590. It's a Seventh Circuit decision. In that case, the government did not defend the board's decision, but this court nevertheless found it appropriate under the circumstances to analyze the merits and the errors that were raised by the petitioner. I want you to know we're fully aware of what we can do. If you're trying to tell us what we can do... We would request, Your Honor, that this court address at a minimum the past persecution issue to provide some affirmative guidance to the board on remand. We believe that it would clarify the issues and focus the issues, and the board then on remand can determine whether or not the government has met its burden of rebutting the presumption of a well-founded fear, and we ask for a ruling in that regard. Thank you. Thank you, Mr. Sontenheim. Thanks to both counsel. The case will be taken under advisement.